FILED

2013 FEB 28  PM 3:38

CLERK U.S. DISTRICT
NORTHERN DISTRICT OF OHIO
AKRON

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF OHIO

### EASTERN DIVISION

CASE NO.: 1:13 CV 436

JUDGE WELLS

JUDGE

MAG. JUDGE McHARGH

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel., PATRICE SIDLER 25 Windsor Drive Oak Brook, IL 60523-2344 | ) ) ) ) |
| Relator, | ) ) |
| v. | ) ) |
| DEVRY,INC., an Delaware corporation CT Corporation System 1300 East 9th Street Cleveland, OH 44114 | ) ) ) ) ) |
| and | ) ) |
| DEVRY UNIVERSITY, INC., an Illinois corporation CT Corporation System 1300 East 9th Street Cleveland, OH 44114 | ) ) ) ) ) ) |
| and | ) ) |
| DEVRY, INC. subsidiaries including Advanced Academics, American University of the Caribbean School of Medicine, Becker Professional Education, Carrington College, Carrington College California, Chamberlain College of Nursing, , DEVRY University, Ross University, School of Medicine and Ross University School of Veterinary Medicine and John Doe entities 1-10, being fictitiously named subsidiaries of DEVRY, Inc., | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Respondents. | ) ) |

**COMPLAINT**
Filed under seal pursuant to
31 U.S.C. 3730(b)(2)

Jury trial demanded herein

1

Relator Patrice Sidler, for her complaint against Respondents, DEVRY, Inc., DEVRY University, Inc., and subsidiaries of DEVRY, Inc. alleges as follows:

## INTRODUCTION

1. The United States Department of Education administers federal student aid programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq. ("Title IV HEA programs").

2. These programs provide students with financial aid in the form of grants and loans guaranteed by the federal government.

3. From at least 2006 to the present, Respondents DEVRY, Inc., DEVRY University, Inc. and the subsidiary companies listed in the caption (collectively "DEVRY" or "Respondents") knowingly presented and/or made, or caused to be presented and/or made, false claims to participate in Title IV HEA programs.

## JURISDICTION AND VENUE

4. Relator Patrice Sidler alleges causes of action, on behalf of the United States, under 31 U.S.C. § 3729 et seq. of the False Claims Act ("FCA") arising from Respondents' false claims made, or caused to be made, to agencies of the United States Government, specifically student financial aid programs administered by the U.S. Department of Education ("Department of Education").

5. Relator Sidler is the original source of all the allegations contained in this Complaint.

6. Relator has provided the government with a confidential disclosure statement and exhibits to substantiate her allegations.

7. Jurisdiction over this action is conferred upon this Court by 31 U.S.C. § 3732 and 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

## THE PARTIES

### The Relator

8. A resident of Oak Brook, Illinois, Relator Sidler was employed by the Respondent DEVRY, Inc. from August 2008 to October 2010 as Director of Business Intelligence.

9. As Director, Relator Sidler managed academic reporting and institutional research with a staff of five professionals.

10. She became familiar with databases used for managing marketing activities, customer service, student grade and attendance records, faculty personnel data, accounting, and IT service records of DEVRY University, Chamberlain College of Nursing, and Carrington Colleges.

11. She and her staff analyzed internal and external data sources to understand operational performance and student outcomes.

### The Respondents

12. Respondent DeVry, Inc. is a publicly-traded corporation, organized under the laws of the State of Delaware, which maintains its corporate headquarters in Oak Brook, Illinois.

13. DeVry, Inc. operates subsidiaries including Advanced Academics, American University of the Caribbean School of Medicine, Becker Professional Education, Carrington College, Carrington College California, Chamberlain College of Nursing, , DeVry University, Ross University, School of Medicine and Ross University School of Veterinary Medicine and possibly John Doe entities 1-10, being fictitiously named subsidiaries of DeVry, Inc..

14. DeVry, Inc. and its subsidiaries are one of the largest for-profit post-secondary educational enterprises In the United States, with enrollment exceeding 100,000 students.

15. DeVry, Inc. operates facilities in multiple states and its online division provides services for all colleges within DEVRY.   Students of DEVRY Online are resident in all fifty states.

16. DeVry Inc. wholly-owned subsidiary DeVry University, Inc. is authorized to operate as a postsecondary educational institution by the Illinois Board of Higher Education,

17. DeVry University, Inc. is an Illinois corporation.

18. The rule breaking false claims complained of herein are a general policy of the Respondents, therefore, Respondents will be collectively referred to as DEVRY.

## FEDERAL STATUTORY BACKGROUND

19. For violations occurring prior to May 20, 2009, the false claims provisions at 31 U.S.C. §3729(a)(1) (1986 version), provide that a person is liable to the United States government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government…[a] false or fraudulent claim for payment or approval."

20. For violations after May 20, 2009, the false claims provisions at 31 U.S.C. § 3729(a)(1)(A) as amended in 2009 provide that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" shall be liable to the United States Government.

21. Since May 20, 2009, the FCA defines "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, of the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded…" 31 U.S.C. §3729(b)(2)(A).

22. The false statements provision of the FCA, prior to 2009 amendments, provides that a person is liable to the United States Government for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government. 31 U.S.C. § 3729(a)(2) (1986 version).

23. As amended in 2009, the FCA false statements provision makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §3729(a)(1)(B) (2009 version).

24. The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b) (1986 version); 31 U.S.C. §3729(b)(1)(A) (2009 version). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. §3729(b) (1986 version); 31 U.S.C. §3729(b)(1)(B) (2009 version).

## FACTUAL BACKGROUND

### Conditions precedent to receive Title IV Grants and Loans

25. Federally guaranteed student loans or grants made pursuant to Title IV HEA programs, provide DEVRY over 90% of its revenues from U.S. undergraduate tuition, book, and fee sources since a substantial majority of the students recruited to and enrolled in DEVRY Institutions receive federally supported financial aid as a result of Title IV HEA programs.

26. Proceeds from Title IV HEA grants and loans are disbursed not to student borrowers, but to DEVRY and other purportedly eligible post-secondary institutions.

27. As a legal prerequisite and condition for receiving these loan or grant proceeds, DEVRY is required to make certain explicit certifications on the face of a Program Participation Agreement

("PPA") entered with the Department of Education by each such school. The Program

Participation Agreements themselves make clear to the institutional representative signing each

such Agreement on behalf of the institution that the "execution of this Agreement by the

institution and the Secretary is a prerequisite to the Institution's initial or continued participation

in any Title IV, HEA Program."

28. Among the explicit certifications and statements signed by and on behalf of each DEVRY

subsidiary was a certification that the DEVRY institution agreed to follow all regulations relating

to "for-profit" colleges as specified in 34 CFR 600.5 and 34 CFR 600.7 to be eligible for federal

funding under the following programs:

    a.  Federal Pell Grant:   20 USC 1070a et seq., 34 CFR Part 690

    b.  Federal Family Education Loan Program:   20 USC 1071 et seq, 34 CFR Part 682

    c.  Federal Direct Student Loan Program: 20 USC 1087a et seq, 34 CFR, Part 685

    d.  Federal Perkins Loan Program: 20 USC 1087 aa et seq, 34 CFR, Part 674

    e.  Federal Supplemental Education Opportunity Grant:  20 USC 1070, 34 CFR Part 676

    f.  Federal Work Study Program: 42 USC 2751 et seq, 34 CFR Part 675

29. Annually, DEVRY representatives signed Program Participation Agreements (PPA) with the

Secretary of the Department of Education as required under 20 U.S.C. § 1094, agreeing to be

"liable for all improperly administrated funds received or refunded under the title IV HEA

program, including any funds administered by a third party servicer."

30. That certification by each DEVRY institution participating in the Title IV programs constituted

an explicit representation that DEVRY had met, and intended to continue to meet, the terms of

the statutory provisions enacted as 20 U.S.C. § 1094(a)(20), which provides that every such PPA

shall "condition the initial and continuing eligibility of an institution to participate in a program upon compliance" with aforementioned statutes.

31. From 1998 – 2008, governing law pertaining to 90/10 was PL105-244. This regulation mandated institutions evaluate their cash accounting basis for student revenue and calculate the ratio of Title IV funds remitted to their students relative to all pertinent cash revenue. If the ratio exceeded 90/10, the institution must report this and must return all Title IV money to the Department of Education.

32. Subsequent to failing a 90/10 ratio, the institution would become ineligible to participate in the Title IV programs for the following year. *See,* 34 C.F.R. §600.5 (f) and (g). and 34 C.F.R. 668.14(b)(16) and also be subject to sanctions described in § 668.28(c).

<u>**COUNT I:**</u>

<u>**Submission of false data on the Eligibility and Certification**</u>

<u>**Approval Report ("ECAR") system**</u>

33. The above allegations are incorporated by reference as if fully rewritten herein.

34. To continue to receive Title IV HEA funding, DEVRY falsified accounting records and submitted false data to the government on the ECAR system.

35. DEVRY manipulated the "90/10" ratio to make it appear that more cash revenue was generated from "outside sources."

36. DEVRY included employee tuition reimbursement and tuition waivers as "outside sources of income" or "non-Title IV revenue," in violation of 34 C.F.R. § 668.28(a)(5)(iv) (falsifying scholarships), illegally incorporated tuition waivers for repeated courses (claiming it to be an outside revenue source), concocted multiple illegal schemes to discount tuition while claiming it was fully-funded from outside sources.

37. These fraudulent revenue calculations and financial statements were relied upon by the

Department of Education as legitimate evidence of administrative and fiscal stability and are

fundamental components to qualify for and maintain eligibility for Title IV funding. Due to the

fraud, DEVRY was able to maintain eligibility for continued Title IV grants and loans.

38. DEVRY's dishonesty in financial reporting from 2006-to present resulted in over $8 billion in

illegally-obtained revenue from Title IV funding.

## COUNT II:

### Misrepresentation of Compliance with fiduciary standards

39. Under the authority of the United States Department of Education, accreditation agencies require

colleges to maintain academic, operational, and fiscal standards of a fiduciary of the

government.[1] The Program Participation Agreement (PPA) signed by DeVry, Inc. President

David Pauldine, authorized representatives demonstrates agreement to the regulations on behalf

---

[1] **1. DeVry Inc. and DeVry University failed these NCA-HLC accreditor standards:**
**Core Component 1d** The organization's governance and administrative structures promote effective leadership
and support collaborative processes that enable the organization to fulfill its mission.
- *The distribution of responsibilities as defined in governance structures, processes, and activities is*
  *understood and is implemented through delegated authority.*
- People within the governance and administrative structures are committed to the mission and
  *appropriately qualified* to carry out their defined responsibilities.
- Faculty and other academic leaders *share responsibility* for the coherence of the curriculum and the
  integrity of academic processes.
- *Effective communication facilitates governance processes and activities.*
- The organization evaluates its structures and processes regularly and *strengthens them* as needed.
**Core Component 1e** The organization upholds and protects its integrity.
- The activities of the organization are congruent with its mission.
- The board exercises its responsibility to the public to ensure that the organization operates legally,
  responsibly, and with fiscal honesty.
- The organization *understands and abides by local, state, and federal laws and regulations applicable to*
  *it (or bylaws and regulations established by federally recognized sovereign entities).*
- The organization consistently implements *clear and fair policies* regarding the rights and responsibilities
  of each of its internal constituencies.
- The organization deals *fairly with its external constituents*.
- The organization *presents itself accurately and honestly to the public.*
- The organization *documents timely response to complaints and grievances, particularly those of*
  *students.*

of all branch campuses[2]. The HLC website designates that DeVry Inc. with the HLC institution ID 1784, was accredited as a *"single entity"* on February 1, 2002.

*(http://www.ncahlc.org/component/com_directory/Action,ShowBasic/Itemid,/instid,1784/)*

40. From 2006 - 2008, DeVry Inc. CEO, Hamburger, along with DeVry University President, David Pauldine, and other executives, conspired to create an organizational matrix structure designed to circumvent regulatory oversight by creating decentralized business units.

41. To incentivize risk-taking, competition, and profit maximization amongst Campus Presidents, the newly deregulated organization encouraged self-governance and unconventional independence.

42. This structure enabled each business unit within DEVRY to operate without constraints of internal control compliance, academic shared responsibility, or fiduciary mandates.

43. The reorganization was a deliberate action to avoid knowledge of legal and regulatory fraud and minimize risk of exposure while maximizing short-term profit-taking and executive bonuses.

44. In 2008, after months of planning, "Project Unite" and "Project Ignite" were announced, with President Pauldine stating that this organizational change "marks the beginning of our new organization – an organization in sync with *a market share capture strategy*. We now are comprised of 43 **independent**, focused business units with accountability and ownership for success to grow....ready to ignite *unprecedented growth!" (Project Unite Resource Manual, pg 45):* "Project Unite is the reorganization of DeVry University business units to match the organization to our strategy of achieving the full potential of DeVry University. Project Unite assigns a single, fully accountable leader to each DeVry metro ("metro" is a main campus and its

---

[2]§ 668.14 Program participation agreement. **(a) (2)** An institution's program participation agreement applies to each branch campus and other location of the institution that meets the applicable requirements of this part unless otherwise specified by the Secretary.

affiliated locations). Under Project Unite, the Department of Enrollment Management, which currently reports to the Home Office, will report directly to the president of each metro."

45. This dispersal of responsibility and accountability effectively disabled regulatory compliance and internal auditing.

46. This organizational structure not only failed Department of Education and state agency standards, but also accrediting agency requirements given that governance, internal controls, compliance and auditing were decentralized. Effectively with this change, all divisions were independent entities, contrary to the PPA signed for Title IV funding participation

47. Sr. VP of HR, Donna Jennings, along with her staff and attorneys, managed internal investigations of employee allegations of fraud and misconduct, enabling them to silence wrongdoing and conceal legal failings from the Internal Audit committee of the Board. Management turnover, forced retirements, involuntary separations and reorganizations enabled continuance of fraud.

48. Elizabeth Truelove McDermott, Senior Director of Internal Audit, reported to Sr. VP Compliance & Ethics (Sharon Thomas-Parrot), who reported to CEO Hamburger. All of these employees were incentivized with financial compensation (bonuses) related to increasing profits.

49. Then, in 2010, after Realtor's discoveries and internal whistleblowing, Hamburger announced multiple organizational reporting changes, putting Internal Audit under the retiring CFO, Richard Gunst. Maurice Crescenzi, Director of Global Compliance and Compliance and Ethics Officer, moved to report to Greg Davis, General Counsel. [3]

---

[3] For documentation of corporate structure relative to willful blindness, see also: William H. Simon, *Wrongs of Ignorance and Ambiguity: Lawyer Responsibility for Collective Misconduct*, 22 YALE J. ON REG. 1, 5-8 (2005); Robert CONN. L. REV. 1185, 187-88 (2003); Roger C. Crampton, *Enron and the Corporate Lawyer: A Primer on Legal and Ethical Issues*, 58 BUS. LAW. 143, 162-64 (2002). Milton C. Regan, *Teaching Enron*, 74 FORDHAM L. REV. 1139.

50. The Kinect Strategic Plan further distanced the Online Operations from accountability to DeVry University and their Campus Operations. This led to significant inconsistencies in policies, power struggles, and organizational failures which constituted breach of fiduciary duty and conspiracy to conceal these breaches of fiduciary duty pertaining to 34 CFR 668.16(b)(4) – (c)(1-6).[4]

51. DEVRY also failed to comply with accreditation mandates regarding *centralized* cataloging, management, and resolution of student complaints since the decentralized structure encouraged variable grievance procedures and widely differing resolutions without the scrutiny of internal compliance or academic auditors.

52. DeVry University's Admissions Training on Regulatory Compliance detailed a complex student coding structure to capture the maximum allowable state grants and the maximum allowable federal grants and loans. The multifaceted coding scheme enabled re-assignment of students (codes) for purposes of profit maximization and to skirt enrollment requirements of state license agency mandates. (Regulatory Compliance Guidance, Jennifer McClure, July 2007) .

53. That the defendant, DeVry Inc, willfully created the decentralized organizational structure with conscious purpose to avoid regulation is evident in written materials as well as in management

---

1230-32 (2005); Reinier H. Kraakman, *Gatekeepers: The Anatomy of a Third-Party Strategy*, 2 J.L. ECON. & ORG. 53 (1986).

[4] 34 CFR 668.16: (4) Has written procedures for or written information indicating the responsibilities of the various offices with respect to the approval, disbursement, and delivery of Title IV, HEA program assistance and the preparation and submission of reports to the Secretary; (c)(1) Administers Title IV, HEA programs with adequate checks and balances in its system of internal controls; and (2) Divides the functions of authorizing payments and disbursing or delivering funds so that no office has responsibility for both functions with respect to any particular student aided under the programs. For example, the functions of authorizing payments and disbursing or delivering funds must be (3) *Provide for consistent application of standards to all students within categories of students*, e.g., full-time, part-time, undergraduate, and graduate students, and educational programs established by the institution;(4) Provide for a determination at the end of each increment by the institution as to whether the student has met the qualitative and quantitative components of the standards (as provided for in paragraphs (e)(2)(i) and (ii) of this section); (5) Provide specific procedures under which a student may appeal a determination that the student is not making satisfactory progress; and (6) Provide specific procedures for a student to re-establish that he or she is maintaining satisfactory progress.

actions.  Management reactions to the Realtor's evidence of misconduct demonstrated continued conspiracy to defraud.

## COUNT III:

### Misrepresentations of the nature of DEVRY educational programs

54. The above allegations are incorporated by reference as if fully rewritten herein.

55. DEVRY knowingly falsified statements in brochures, handbooks, promotional materials, written and oral statements in emails, powerpoint presentations, internally-controlled websites, official documents provided to federal and regional accreditation agencies, official documents provided to the state agency of the Illinois Board of Higher Education, SEC-mandated documents, and official correspondence to the Department of Education and Congress, contrary to the regulations outlined in 34 C.F.R. § 668.71 and 34 C.F.R. § 668.72 .

56. DEVRY, through annually signing the PPA, agreed to comply with 34 C.F.R. § 668.71(b)(c) which defined substantial misrepresentation:  "An eligible institution is deemed to have engaged in substantial misrepresentation when the institution itself, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, marketing, advertising, recruiting or admissions services, makes a substantial misrepresentation regarding the eligible institution, including about the nature of its educational program, its financial charges, or the employability of its graduates. Substantial misrepresentations are prohibited in all forms, including those made in any advertising, promotional materials, or in the marketing or sale of courses or programs of instruction offered by the institution.

57. DEVRY representatives regularly, knowingly made misleading statements, failing to comply with 34 C.F.R. § 668.71 (c ) "Any false, erroneous or misleading statement an eligible

institution, one of its representatives, or any ineligible institution, organization, or person with

whom the eligible institution has an agreement to provide educational programs, or to provide

marketing, advertising, recruiting or admissions services makes directly or indirectly to a

student, prospective student or any member of the public, or to an accrediting agency, to a State

agency, or to the Secretary. A misleading statement includes any statement that has the

likelihood or tendency to deceive or confuse. A statement is any communication made in writing,

visually, orally, or through other means."

58. Specifically, DEVRY's misrepresentations included false or misleading statements regarding the

following categories as outlined by 34 C.F.R. § 668.72:

d)The requirements for successfully completing the course of study or program and the circumstances that would constitute grounds for terminating the student's enrollment;
(f) Its size, location, facilities, or equipment;
(g) The availability, frequency, and appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet;
(i) The number, availability, and qualifications, including the training and experience, of its faculty and other personnel;
(k) The nature and availability of any tutorial or specialized instruction, guidance and counseling, or other supplementary assistance it will provide its students before, during or after the completion of a course;
(l) The nature or extent of any prerequisites established for enrollment in any course;
(m) The subject matter, content of the course of study, or any other fact related to the degree, diploma, certificate of completion, or any similar document that the student is to be, or is, awarded upon completion of the course of study;

59. Prospective and enrolled students in the degree program known as Associates in Health

Information Technology ("AHIT") were given misinformation and faced deceptive practices

pertaining to practicum availability and practicum pre-requisites, as well as requirements for

health and criminal background checks, drug screening and residency requirements.

60. DEVRY Online was not prepared to place students into practicum sites throughout the United

States and did not appropriately restrict their sales agents and recruiters despite known internal

problems related to practicum location constraints, insufficient practicum-provider contractual

agreements, insufficient faculty, or program capacity constraints.

61. Approximately 14,000 enrolled students nationwide were misinformed and deceived between

2007-present.

62. Fewer than 900 online students have received their AHIT degree (between 2009-2012) due to the

poorly managed program. Many students, waiting an inordinately lengthy time for practicum

placement, withdrew from DEVRY with very few transferrable credits yet excessively high debt

from student loans. Some insistent and agitated students were allowed to "pass" practicum

courses without any external practicum which fails the accreditor's standards.

63. To obtain and maintain accreditation, DEVRY provided false information to the national

accreditor, the Commission on Accreditation for Health Informatics and Information

Management ("CAHIIM"), related to their curriculum, academic standards, personnel, and

program policies. The Illinois Board of Higher Education has the responsibility for granting

approval and authorizing changes to programs, courses of study, and institutions approved to

operate in the State of Illinois, subject to rules specified by the Private Business and Vocational

Schools Act (Public Act 97-650) and 105 ILCS 426, **110 ILCS 1005,** . "The Board carries

out ongoing reviews of those independent institutions operating and offering degrees under the

Board's authorization to assure that the institutions maintain the conditions under which the

original authority to operate or grant degrees was given. The Board has the power to revoke its

authorization if an institution fails to sustain the conditions required by the initial approval to

operate or grant degrees. (http://www.ibhe.org/aboutBHE/default.htm),

64. DEVRY misled the Illinois Higher Board of Education, the agency which licenses DEVRY to

offer Online Degrees, regarding the nationwide AHIT recruiting plans, enrollment projections,

qualified personnel, academic policies, curricula, and governance

(http://www.ibhe.org/Academic%20Affairs/NOI03/Nov/1103_DeVry.pdf).   misled this state

agency so as to recruit students for the AHIT program nationwide and capture federal funding

beyond the state's borders.  Other state agencies who provided licensure to DeVry were also

similarly misled.

65. DEVRY knowingly enrolled thousands of AHIT students throughout the United States without
the capacity to provide  requisite courses and practicums.

66. DEVRY changed written policies often, with some policies changing multiple times during the
course of a year.

67. The changing governance of student conduct created inequality between student groups and
unethical, unfair burdens on those caught unaware of changes.

68. The oft-changing student handbook was considered "sensitive, confidential information" only to
be shared with admitted and enrolled students to avoid regulatory scrutiny, shareholder and
prospective student scrutiny, and competitor knowledge of trade secrets pertaining to misleading,
illegal policies.

69. DEVRY created burdensome student handbooks that varied significantly amongst campuses and
online to thwart students' ability to understand and comply with the myriad of internal and
conflicting regulations.

70. Students, their advisors, faculty, and deans were confused as to which rules applied in various
circumstances thereby confounding the students' ability to manage the grievance process within
allowed time constraints. This confusion was due to multiple codes assigned to students based on
their "home" campus and/or their  "course-taking mode" which varied by student by semester
and often, by course, within a session.   The multifaceted coding and re-coding required re-

assignment of students (codes) for purposes of profit maximization and to skirt enrollment

requirements of state license agency mandates. (Regulatory Compliance Guidance, Jennifer

McClure, July 2007) Students caught unaware of their shifting campus/online reassignments

were frustrated by handbook and policy/process variances where responsibility for complaint

resolution often required negotiating burdensome bureaucracy, oft resulting in Dean's

"approval" of "variances" that were outside of their official authority or recompense (i.e. hush

money) that didn't meet academic standards of the accreditor or state agency.

71. Importantly, DEVRY failed to meet its obligations under 34 C.F.R. § 668.82 (Standard of

Conduct) which requires that the participating institution act in the capacity of a fiduciary and be

subject to the highest standard of care and diligence in administering programs.

### COUNT VI:

### Violation of Student Speech and Associational Rights

Congress provided specific protection of student speech and association rights in 20 USC

§ 1011a which states as follows:

(a) Protection of rights
(1) It is the sense of Congress that no student attending an institution of higher education
on a full- or part-time basis should, on the basis of participation in protected speech or
protected association, be excluded from participation in, be denied the benefits of, or be
subjected to discrimination or official sanction under any education program, activity, or
division of the institution directly or indirectly receiving financial assistance under this
chapter and part C of subchapter I of chapter 34 of title 42, whether or not such program,
activity, or division is sponsored or officially sanctioned by the institution.
(2) It is the sense of Congress that—
(A) the diversity of institutions and educational missions is one of the key strengths of
American higher education;
(B) individual institutions of higher education have different missions and each
institution should design its academic program in accordance with its educational goals;
(C) an institution of higher education should facilitate the free and open exchange of
ideas;
(D) students should not be intimidated, harassed, discouraged from speaking out, or
discriminated against;
(E) students should be treated equally and fairly; and

(F) nothing in this paragraph shall be construed to modify, change, or infringe upon any constitutionally protected religious liberty, freedom, expression, or association.

72. DEVRY actively managed social media and public complaint websites (e.g. facebook, linked-in, http://www.complaintsboard.com/ ) to minimize exposure of problems with the AHIT and other underperformikng programs.

73. Students who suggested that they were planning legal action or planning to go to the media or complained to their advisors were sanctioned by DEVRY based on an unpublished, "Student Code of Conduct" within the "Student Handbook".   Within internal documents, the  DeVry Online Student Complaint policy stated:  "All student issues that may involve a threat or actual contact with the media, legal representation, regulatory agency or accrediting body should be directed to Student Services' Directors.   The student's record in RightNow system will be locked and advisors will be unable to update it. *In these cases, we should not provide the student with any additional information or service."*

74. Disciplinary actions threatened included suspension or expulsion.

75. This violated constitutionally protected free speech as well as educationally protected speech (20 USC § 1011A (a)).

## COUNT V:

### Substantial misrepresentations

### related to Employment Statistics

76. The above allegations are incorporated by reference as if fully rewritten herein.

77. In violation of 34 C.F.R. § 668.71, § 668.72,  34 C.F.R. § 668.74(f), 668.41(ii)(d)(5), 668.14(a) and 668.14(b)(10)(i)(ii), and 668.6(b)(1)(iv), DEVRY knowingly falsified employment statistics

and published them on their website, in TV and radio advertisements, and other publications to deceive students, regulators, and stock holders.

78. Since 1965 Federal regulations have required truthful disclosure regarding gainful employment.

79. On July 1, 2011, stricter new gainful employment laws were enacted which defined significant penalties for underperforming programs, eliminating their funding as early as 2015.

80. DEVRY knowingly published false and misleading gainful employment rate data throughout the years 2000-2011. DEVRY oft quoted their "90/40" employment rate, stating that 90% of their grads were employed in fields related to their education, earning an average of $40,000/yr.

81. Prior to 2011, they did not provide information on methodology of calculations. In 2011, DEVRY was mandated to disclose its data gathering and statistical methodology.

82. DEVRY failed to disclose essential information about the student population, definitions of categories of students, participation rates, and eligibility data.

83. The primary failing of the DEVRY employment statistics is that they fail to account for many graduates, preferring to call a large group "ineligible" for inclusion in the data set without explicitly stating all the reasons for "ineligibility."

84. Referencing theDEVRY website data for the 2010 graduating class, **1685** grads were ineligible for any career assistance:

85. DEVRY marketing information states these graduates are ineligible because they are "continuing their education, foreign graduates legally ineligible to work in the United States/Canada and those unable to accept career advising assistance because of extreme circumstances such as military deployment, national service (Peace Corps, Teach for America, etc.), participation in a religious mission, incarceration, critical illness or death."

86. DEVRY chose to mislead because the vast majority in this ineligible category are employed by DEVRY. DEVRY did not want to admit that so many of their graduates were employees who were coerced to enroll.

87. Admitting that paid staffers were virtually required to seek DEVRY degrees would cause many to doubt the quality of this "free" education.

88. DEVRY chose to omit that important detail in the marketing propaganda but, when questioned under oath at the Senate Committee on Health, Education and Welfare, Sharon Thomas Parrot, SVP Government and Regulatory Affairs & Chief Compliance Officer for DEVRY Inc., contradicted DEVRY's marketing. (June 24, 2010 hearing). Sharon Thomas Parrot told a different story in speaking about the employment/placement rate methodology and populations included: "All graduates, other than those continuing their education, foreign graduates legally ineligible to work in the United States or Canada, *our own employees*, national servicemen and women, foreign residents, graduates we are unable to locate and those ineligible for career assistance because of extreme circumstances,… include(ing) death, suffering from a serious illness or medical condition, maternity/paternity leave, participation in religious mission work, incarceration or community service that prevent a graduate from obtaining employment during this time period." (**http://www.faqs.org/sec-filings/100715/DEVRY-INC_8-K/a6361777ex99-1.htm**)

89. That DEVRY marketing chose to omit a very significant category deemed "ineligible" is conspicuous because that category comprises a very large number of the "ineligible" graduates who get a "free" degree so as to pad the enrollment numbers. And that Thomas-Parrot quietly included these "non-eligible graduates" indicates that she knowingly tolerated misleading

advertising in TV commercials, brochures, websites, annual academic catalogs, annual reports.

Her own compliance department approves of all Marketing Messages and the Academic Catalog.

90. Further deception occurs when some grads are excluded in the data set because they were considered "inactive" in their job search: For 2010, this encompasses a large number: 895 graduates. DEVRY removes many graduates from the "active graduates seeking employment category" if the student doesn't adhere to strict standards of contact with the career services office (regardless of the students' perception of value of those services). DEVRY simply calls these graduates "inactive in a job search" to remove them from their calculations and improve their numbers since career advisors are retained and promoted based on their placement stats.

91. DEVRY knowingly misleads by failing to report other disturbing statistical tricks such as counting one person as two people if they earn two degrees simultaneously (thus they can "count" successful grads twice for one job). DEVRY also counts graduates as "employed placements" even if they held this same job prior to their enrollment. DEVRY has multiple "other disqualification" categories to improve their stats which are not reported.

## COUNT VI:

### Illegal recruiting compensation and

### deceptive sales techniques

92. The above allegations are incorporated by reference as if fully rewritten herein.

93. DEVRY has already been sanctioned by the Department of Education and the Department of Justice for recruiting violations.

94. However, recruiting and recruiter compensation schemes continue unchecked. For example, the sales team names (from 2010) indicate the competitive nature of the sales environment,

including: "Predator", "Xtreme", "Blazing Fury", "Tsunami", "Renegade", "Task Force Zulu",

and "Hurricane".   (DA-Dean Report-2010SummerA-Week 7-2010—6-14.xls)

95. Enrollment advisors are pressured to "push" student financial aid options to entice naïve students

who have little worldly knowledge of interest accumulation, debt, and legal issues surrounding

the educational loans which cannot be discharged in bankruptcy.

96. The following DEVRY Sales Chart reveals the seller's reliance on financial aid and some of the

detail with which DEVRY tracks every aspect of the sales process:

| TUITION TYPES | | APPS | DOCS RECV'D |
|---|---|---|---|
| FINANCIAL AID | | 5,050 | 2,751 |
| MIL - TA | | 447 | 159 |
| GI BILL - VET. | | 197 | 106 |
| VOC REHAB | | 29 | 8 |
| DEFERRED PLAN | | 104 | 44 |
| COMPANY VOUCHER | | 34 | 18 |
| CEP/CLPB | | 69 | 36 |
| FULL CASH | | 82 | 29 |

(DA-Dean Report-2010SummerA-Week 7-2010—6-14.xls)


## COUNT VII: RETALIATORY DISCHARGE

97. The above allegations are incorporated by reference as if fully rewritten herein.

21

98. The violations which Relator reported included violations of the False Claims Act 31 U.S.C. § 3729, et seq. and Federal Regulations relating to the disbursement of Title IV HEA funds.

99. Pursuant to 31 U.S.C. §3730(h), there is a specific cause of action for employees, contractors, or agents who are disciplined or discharged for their efforts at taking steps to stop violations of the False Claims Act.  Relators reporting of violations to DEVRY administrators was done to stop further violations within the meaning of this section.  Relator reported violations to the Department of Education's Office of Inspector General during her tenure as well.

## CONCLUSION

100.  The above allegations are incorporated by reference as if fully rewritten herein.

101.  In performing the acts set out above, DEVRY knowingly presented, or caused to be presented, to the Department of Education (or to Guaranty Agencies operating as agents of and with funds of the Department of Education) and to other officers, employees or agents of the United States, false claims for approval and payment out of the funds of the United States and caused losses to the United States in the amounts of those payments for grant proceeds, loan proceeds, interest subsidies, special balance payments, and loan insurance guaranty payments, as to each and every such claim and payment proceeds of which were disbursed guaranty payments, any lender to any enrollee of any DEVRY institution  since the date when DEVRY first started causing such false claims to be made.

102.  DEVRY knowingly used and caused false and fraudulent PPA certifications, and other representations that DEVRY and its subsidiaries were institutions eligible to receive proceeds from related Department of Education programs, and other false and fraudulent records as set forth above, to be used as an Integral part of and as material to the process of and conditions for

causing false and fraudulent claims made to the Department of Education (or to Guaranty

Agencies operating as agents of and with funds of the Department of Education) and to other

officers, employees or agents of the United States, for grant proceeds, loan proceeds, interest

subsidies, special allowance payments and loan Insurance guaranty payments, as to each and

every such false claim and payment, proceeds of which were disbursed directly or indirectly to

DEVRY or its subsidiaries (or, as to Insurance guaranty payments, any lender to any enrollee of

any DEVRY Institution), since the date when DEVRY first started causing such claims to be

made (or since the date when DEVRY first decided to engage in conduct in violation of the

enrollment recruitment Incentive all such claims being legally false, and in violation of 31 U.S.C.

§ 3729(a)(1)(B) & (G).

103.     By virtue of and as a result and cause of the false claims presented or caused to be

presented by DEVRY, the United States of America has suffered actual damages and is entitled

to recover three times the amount by which DEVRY received in student loan or grant funds,

plus monetary penalties of not less than $5,500 and not more than $11000 for each of the false

claims presented or caused to be presented, and other monetary relief  as determined appropriate

from the evidence to be presented at the trial hereof.

**WHEREFORE,** Relator Sidler demands judgment for all of the following:

   a)  That this Court enter a judgment against Respondents in an amount equal to three times

       the amount of damages the United States Government has sustained because of

       Respondents' false claims plus a civil penalty of $5,000 to $10,000 for each violation of

       31 U.S.C. § 3729.

   b)  That Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False

       Claims Act;

c) That Relator be awarded reinstatement, two times the amount of back pay, interest on the

back pay and compensation for special damages, including attorney fees and costs,

against DEVRY pursuant to 31 U.S.C. § 3730(h).

d) That Relator be awarded all costs and expenses incurred, including reasonable attorneys'

fees; and

e) That the Court order such other relief as is appropriate.

Respectfully submitted,

WARNER MENDENHALL, #0070165
Law Offices of Warner Mendenhall, Inc.
190 N. Union St., Ste. 201
Akron, OH  44304
(330) 535-9160; fax (330) 762-9743
warnermendenhall@hotmail.com
*Attorney for Relator*

## JURY DEMAND

Relator hereby demands a trial by Jury pursuant to R. 38 of the Federal Rules of Civil Procedure.

Warner Mendenhall, 0070165